**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| WILLIE G. FOLMAR, JR., | CASE NO. 1:22-CV-1236 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff Willie G. Folmar, Jr. ("Plaintiff" or "Mr. Folmar") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter is before the undersigned pursuant to the consent of the parties under 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (ECF Doc. 7.) For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

### I.      Procedural History

On June 17, 2020, Mr. Folmar filed applications for DIB and SSI. (Tr. 322-32, 334-35.) He alleged a disability onset date of May 26, 2020. (Tr. 334.) He alleged disability due to diabetes, high blood pressure, high cholesterol, PTSD, and depression. (Tr. 87, 96.) Mr. Folmar's applications were denied at the initial level (Tr. 94-95, 103-04) and upon reconsideration (Tr. 114-15, 123-24), and he requested a hearing (Tr. 183). On September 22,

2021, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 36-73.)  Mr. Folmar

then filed the pending appeal (ECF Doc. 1), which is fully briefed (ECF Docs. 8, 9, 10).

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Mr. Folmar was born in 1965 and was 54 years old on the alleged disability onset date,

making him an individual closely approaching advanced age under Social Security regulations

on the alleged onset date.  (Tr. 27.)  He had at least a high school education.  (*Id*.)  Mr. Folmar

had not worked since May 25, 2020, the alleged onset date.  (Tr. 17.)

### B. Medical Evidence

Although Mr. Folmar has physical and mental impairments that were identified by the

ALJ (Tr. 17-18), he only challenges the ALJ's decision with respect to his severe mental

impairments (ECF Docs. 8, 10).  The evidence summarized herein is accordingly focused on the

evidence pertaining to Mr. Folmar's severe mental impairments.

#### 1. Relevant Treatment History

Prior to the alleged onset date, on May 20, 2016, Veteran's Administration ("VA")

psychologist Erica J. Sharkansky, Ph.D., completed a Disability Benefits Questionnaire for

Mental Disorders based on her review of Mr. Folmar's medical records and interviews with

collateral witnesses, including his wife.  (Tr. 478-84.)  Mr. Folmar was diagnosed with persistent

depressive disorder (previously classified as dysthymia).  (Tr. 478, 483.)  He was assessed as

having an occupational and social impairment with reduced reliability and productivity.  (*Id.*)

Mr. Folmar reported that he had been acting out angrily against his wife; she made a similar

report and noted that he was more withdrawn, temperamental, and agitated.  (Tr. 480.)  Mr.

Folmar also reported increased conflicts with his coworkers.  (Tr. 481.)  His wife reported that he

had increased problems with concentration, needed constant reminders to do things, had lost interest in activities, and was harder to get along with over the past two years; he also got quiet when irritable, was easily angered, and was withdrawn and moody. (*Id.*) At times, she reported that his anger had resulted in physical altercations with family members. (Tr. 481-82.) Mr. Folmar noted his mood, decision-making abilities, and energy level had worsened. (Tr. 481.)

Dr. Sharkansky noted that Mr. Folmar was attending psychotherapy appointments with the VA, with his last appointment two weeks prior; he was diagnosed with dysthymic disorder. (*Id.*) He indicated that Mr. Folmar last saw his psychiatrist six months prior, on December 16, 2015, when he was diagnosed with: major depressive disorder, in remission; bereavement, improving; and dysthymia. (*Id.*) The following symptoms were noted: depressed mood, anxiety, suspiciousness, chronic sleep impairment, mild memory loss, flattened affect, difficulty in understanding complex commands, impaired judgment, impaired abstract thinking, disturbances of motivation and mood, difficulty in establishing and maintaining effective work and social relationships, difficulty in adapting to stressful circumstances, including at work, and suicidal ideation. (Tr. 482.) On examination, Mr. Folmar had fair eye contact but periodically nodded off, was oriented to time, place, and person, had slowed speech that was clear and of normal volume, and had a flat affect; findings were otherwise normal. (Tr. 483.)

After the alleged onset date, on June 24, 2020, Mr. Folmar attended a telehealth therapy session with social worker Corey Nieding, LISW. (Tr. 489-90.) On examination, he was alert and oriented, cooperative, exhibited normal speech, and had an anxious mood, intact memory, and a normal, coherent thought process. (Tr. 490.) Mr. Folmar reported that he had been let go from his job a couple of weeks prior and said they had refused to let him return to work. (*Id.*) He was almost thankful to not have to deal with the management at that job any longer, and had

been applying for other positions.  (*Id.*)  He was using his free time to complete projects around the house and was working on staying positive.  (*Id.*)

Mr. Folmar met with psychiatrist Alan Castro, M.D., for medication management on July 8, 2020.  (Tr. 484-88.)  He was on Buspar 30mg twice daily and sertraline 150 mg daily, and reported compliance with no emergent side effects.  (Tr. 485-86.)  On examination, he was alert and oriented with normal speech, coherent and goal directed with fair insight and judgment, but had a slightly depressed mood.  (Tr. 486.)  Dr. Castro continued his medications.  (Tr. 488.)

On October 6, 2020, Mr. Folmar again met with Dr. Castro and reported not doing well; he had not found a job, and was less motivated and more irritable.  (Tr. 762-63.)  On examination, he was again alert and oriented, had normal speech, was coherent and goal directed, with a slightly depressed mood and fair insight and judgment.  (Tr. 764.)  Dr. Castro increased his sertraline to 200 mg daily but continued the Buspar at the same dosage.  (Tr. 765.)

At a November 17, 2020 visit with Dr. Castro, Mr. Folmar reported the increase in his sertraline dosage was helping and he was not as upset about things that normally bothered him.  (Tr. 738-39.)  He reported being not as down, and that he had no hopelessness, helplessness, or suicidal ideation.  (Tr. 739.)  On examination, he was alert and oriented, cooperative, had normal speech, was coherent and goal directed, with a slightly depressed mood and fair insight and judgment.  (Tr. 740-41.)  Dr. Castro noted Mr. Folmar was benefiting from the higher dose of sertraline and tolerating it, and continued his medications at the same dosage.  (Tr. 742.)

Mr. Folmar attended therapy with LISW Niedling on November 20, 2020, reporting that he was managing his anger better and had been using his coping skills, but that he continued to have challenges in finding a job and receiving his unemployment compensation.  (Tr. 737.)  On

examination, he was alert and attentive, cooperative, and reasonable, and had intact language, stable mood, normal and coherent thought process, and intact memory.  (Tr. 737-38.)

On February 16, 2021, Mr. Folmar met with Dr. Castro and reported he was "doing alright"; he admitted feeling down at times, but not to the point of feeling hopeless or helpless. (Tr. 722-23.)  On examination, he was alert, oriented, coherent, and goal directed with normal speech and fair insight and judgment, but with slightly anxious mood.  (Tr. 725.)  Dr. Castro continued him on sertraline 200 mg daily and Buspar 30 mg twice daily.  (Tr. 726.)

Mr. Folmar attended therapy with LISW Nieding on February 18, 2021, reporting difficulty paying his bills because of delays in his unemployment payments.  (Tr. 722.)  He was having trouble staying positive, but noted that listening to music and staying grateful was helping to get him through.  (*Id.*)  On examination, he was alert and attentive, cooperative and reasonable, had normal speech, stable mood, intact memory and coherent thought process.  (*Id.*)

At therapy with LISW Nieding on April 8, 2021, Mr. Folmar reported he lacked motivation and was depressed, defensive, and negative, and was only motivated to accomplish things three to four days per week.  (Tr. 717-18.)  On examination, he was alert, attentive, cooperative, and reasonable; he exhibited normal speech, intact memory, and a normal, coherent thought process; but his mood and affect reflected some depression and anxiety.  (Tr. 717.)

At his therapy appointment with LISW Nieding on May 6, 2021, he was observed to be alert, attentive, cooperative, and reasonable; he exhibited normal speech, intact memory, and a normal, coherent thought process; his mood and affect reflected some depression and anxiety. (Tr. 713.)  He reported an exacerbation of his mental health symptoms due to financial and marital stress, but had two job interviews that afternoon, which were expected to reduce some of the stress at home.  (*Id.*)

5

On May 21, 2021, Mr. Folmar met with Dr. Castro for medication management.  (Tr. 707.)  He reported he was not doing well and felt down, helpless, and stuck because he had been off work for ten weeks and had yet to receive unemployment; he had not received responses from the places he applied to.  (*Id.*)  He was on sertraline 200 mg once a day and Buspar 30 mg twice daily.  (*Id.*)  He reported his medications seemed to help, but admitted he forgot to take Buspar in the afternoon at times.  (Tr. 708.)  Dr. Castro continued his medications.  (Tr. 707-08.)

On August 13, 2021, Mr. Folmar attended a therapy session with LISW Nieding.  (Tr. 791.)  On examination, he was alert, attentive, cooperative, reasonable, clean, and well groomed; he exhibited normal speech, intact memory, and a normal, coherent thought process; his mood was frustrated and his affect flat.  (Tr. 791-92.)  He reported having more bad days than good and continued anger.  (Tr. 791.)  LISW Nieding worked with Mr. Folmar and his wife to practice acceptance and interpersonal effectiveness skills.  (*Id.*)

### 2.    Opinion Evidence

#### i.    Treating Provider

On September 17, 2020, Dr. Castro completed a mental capacity assessment.  (Tr. 554-56.)  He opined therein that Mr. Folmar had *extreme* limitations in his ability to handle conflicts with others and *marked* limitations in his ability to: ignore or avoid distractions while working, work close to or with others without interrupting or distracting them, sustain an ordinary routine and regular attendance at work, work a full day without needing more than the allotted number or length of rest periods during the day, adapt to changes, manage psychologically based symptoms, understand and respond to social cues, respond to requests for suggestions or criticism, and keep social interactions free of excessive irritability or argumentativeness or suspiciousness.  (Tr. 554-56.)  Dr. Castro also opined that Mr. Folmar had *moderate* limitations

with his ability to: follow one- or two-step oral instructions to carry out a task, recognize a mistake and correct it, sequence multi-step activities, work at an appropriate and consistent pace or complete tasks in a timely manner, and cooperate with others or ask for help when needed, and *mild* limitations in his ability to: use reason and judgment to make work-related decisions, initiate and perform a task he knows how to do, distinguish between acceptable and unacceptable work performance, set realistic goals, make plans independently of others, maintain personal hygiene and attire appropriate to a work setting, and be aware of normal hazards and take appropriate precautions.  (Tr. 554-55.)  Dr. Castro noted that Mr. Folmar could be easily distracted and lose his train of thought.  (Tr. 554.)

On August 20, 2021, Dr. Castro completed a mental impairment questionnaire.  (Tr. 773-75.)  He opined therein that Mr. Folmar was *seriously limited but not precluded* in his ability to: complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number of breaks, accept instruction and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting.  (*Id.*)  He further opined Mr. Folmar was *limited but satisfactory* in his ability to: interact appropriately with the general public, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, set realistic goals or make plans independently of others, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, and work in coordination with or in proximity to others without being distracted by them.  (*Id.*)  Dr. Castro indicated that Mr. Folmar had no limitations in all other functional areas.  (*Id.*)

Dr. Castro indicated that he had seen Mr. Folmar every three months since August 2018 and treated him for his major depressive disorder, recurrent, moderate, with a fair prognosis. (Tr. 773.)  He also noted clinical findings of depressed mood, lack of motivation, poor frustration tolerance, and irritability. (*Id.*)  He indicated that Mr. Folmar would be absent from work one day every two weeks and would be off-task twenty percent of the time. (Tr. 775.)

### ii.    Consultative Examination

Mr. Folmar attended a psychological consultative examination with Brian Griffiths, Psy.D., on October 5, 2020. (Tr. 558-564.)  He reported struggling with depression, withdrawing from others, difficulty sleeping, low energy, fatigue, mood swings, easy irritability, poor concentration, impulsive behavior, sometimes hearing things, and experiencing trauma-related symptoms. (Tr. 561.)

On examination, Mr. Folmar had adequate grooming and hygiene. (*Id*.)  His speech was slow and he was slow to respond to test questions; however, he displayed no loose associations, flight of ideas, or delusional beliefs. (Tr. 562.)  He had a depressed mood and a flat affect, and displayed psychomotor retardation, but was not tearful and manifested no indications of anger or hostility. (Tr. 562, 564.)  Dr. Griffiths noted Mr. Folmar's complaints of limited energy and easy fatiguability might be suggestive of somatization. (*Id.*)  He was alert, responsive, and oriented on examination. (Tr. 562.)  His remote recall was adequate. (*Id.*)  As for his short-term memory skills, he recalled six digits forward but not consistently, recalled three digits backwards but not consistently, and remembered one of three objects after a five-minute delay. (*Id.*)  Mr. Folmar was able to follow along in the interview and did not ask the examiner to repeat and/or clarify questions. (*Id.*)  He was able to complete three serial sevens in thirty seconds, count backwards, and complete mental calculations. (*Id.*)  Dr. Griffiths assessed Mr. Folmar as having sufficient

judgment to make decisions affecting his future and conduct his own living arrangements efficiently.  (*Id.*)  Dr. Griffiths offered diagnoses of unspecified bipolar disorder and PTSD.  (Tr. 563.)  He opined that Mr. Folmar's mood extremes may interfere with his ability to keep up with others.  (Tr. 564.)  He also noted that Mr. Folmar's reports of his employment history did not suggest emotional decompensation from exposure to the workplace, but that his temper might have caused interpersonal problems with other employees and management.  (*Id.*)

### iii.        State Agency Reviewers

On October 21, 2020, state agency psychological consultant, Aracelis Rivera, Psy.D., reviewed the record at the initial level and concluded that Mr. Folmar required certain limitations due to his mental health status.  (Tr. 89-91, 98-102.)  Specifically, she opined Mr. Folmar could understand, remember, and sustain tasks that could be learned after a short demonstration, could interact occasionally in situations that did not require resolving conflicts or persuading others to follow demands, and would perform best in a static work environment without strict production standards.  (*Id.*)  At reconsideration on November 25, 2020, reviewing psychologist Vicki Warren, Ph.D., affirmed Dr. Rivera's findings and provided the same limitations.  (Tr. 112-13.)

## C.        Hearing Testimony

### 1.        Plaintiff's Testimony

At his September 22, 2021 hearing, Mr. Folmar testified that he was able to drive.  (Tr. 44.)  He had not worked since March of 2020, and had supervised volunteers to help the homeless once per week, until COVID.  (Tr. 44-45.)  His previous work was at Ground Effects working as a general laborer and an accessory installer.  (Tr. 45-46.)  His position was eliminated in March of 2020 because of the COVID-19 pandemic, and he was not called back when

production resumed.  (Tr. 47-48.)  He reported he was occasionally disciplined in this position due to mistakes in assembling parts.  (Tr. 48.)

Mr. Folmar testified that he was unable to continue working because of his mental capacity.  (Tr. 53.)  He made a lot of mistakes if he was rushed or with a lot of people, but was able to function if he worked alone or with only one other person.  (Tr. 54.)  He reported that he was sometimes written up for mistakes made by other members of his team, which caused the situation to escalate.  (Tr. 54-55.)  He had a low tolerance and got angry quickly.  (Tr. 61-62.)

Mr. Folmar testified that his wife had to assist him with chores, like bringing him food and reminding him to take care of his daily hygiene.  (Tr. 57.)  His wife also did all of the shopping, laundry, cooking, and preparing meals, but he was able to fix himself something to eat if she was unable to.  (Tr. 57-58.)  Mr. Folmar was also able to load the dishwasher, use a robot vacuum, and mop the floors.  (Tr. 58.)  He did not have a regular routine, but he did try to do positive activities like watching tv or attending his grandson's football games.  (Tr. 58-59.)

## 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Mr. Folmar's age, education, and work experience with the function limitations described in the RFC determination could not perform Mr. Folmar's prior work, but could perform representative positions in the national economy, including hand packer, store laborer, and hospital cleaner.  (Tr. 63-65.)  He also testified that it would preclude competitive employment if the person would be off task 10% of the workday or absent more than two days a month after a probationary period.  (Tr. 71-72.)

## III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

11

Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.     The ALJ's Decision

In her October 19, 2021 decision, the ALJ made the following findings:[1]

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.  (Tr. 17.)

2.     The claimant has not engaged in substantial gainful activity since May 25, 2020, the alleged onset date.  (*Id.*)

3.     The claimant has the following severe impairments: depressive, bipolar, and related disorders and trauma and stressor-related disorders.  (*Id.*)

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 18.)

5.     The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to perform simple, routine tasks, but not at a production rate pace, the claimant can have occasional interactions with supervisors, co-workers, and the public, and the claimant is limited to routine workplace changes.  (Tr. 20.)

1.     The claimant is unable to perform any past relevant work.  (Tr. 27.)

2.     The claimant was born in 1965 and was 54 years old, defined as an individual closely approaching advanced age, on the alleged disability onset date.  (*Id.*)

3.     The claimant has at least a high school education.  (*Id.*)

4.     Transferability of job skills is not material to the determination of disability.  (*Id.*)

5.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including hand packer, store laborer, and hospital cleaner.  (Tr. 27-28.)

---

[1] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from May 25, 2020, through the date of the decision on October 19, 2021.  (Tr. 21.)

## V.    Plaintiff's Arguments

Mr. Folmar has presented the following developed arguments for review:[2]

1.      Whether the ALJ erred in assessing the persuasiveness of the opinions of treating psychiatrist Alan Castro; and

2.      Whether the ALJ erred in assessing Mr. Folmar's subjective symptoms under SSR 16-3p, including considering the waxing and waning of his symptoms.

(ECF Doc. 8, pp. 1, 7-21.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less

_____

[2] Although Mr. Folmar has raised other perfunctory arguments in his brief, the Court addresses only those arguments that were clearly articulated and adequately developed; all other arguments are deemed waived.  *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006); *see also McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation , are deemed waived.").

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**     **First Assignment of Error: Whether ALJ Erred in Finding Opinions of Treating Psychiatrist Alan Castro "Not Persuasive"**

Mr. Folmar argues first that the ALJ erred in finding the opinions of treating psychiatrist Dr. Castro "not persuasive."  (ECF Doc. 8, pp. 7-13.)  Specifically, he argues the persuasiveness finding was "contrary to the ALJ's findings and the treatment records," since the ALJ recognized certain abnormal mental status examination findings and reported symptoms (*id.* at pp. 10-11 (citing Tr. 19, 23)) and Dr. Castro's opinions were "supported by and consistent with the other contemporaneous medical records" (*id.* at pp. 11-12).  He also argues the ALJ failed to build a logical bridge between the evidence and the result.  (*Id.* at p. 13.)  The Commissioner responds that the ALJ evaluated the opinions in accordance with the appropriate regulatory factors and "sufficiently explained why he did not find Dr. Castro's opinions persuasive."  (*Id.* at p. 18.)

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).  The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In

other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record.

Before considering Dr. Castro's opinions, the ALJ outlined Mr. Folmar's treatment with Dr. Castro and other providers, analyzed the evidence relevant to her conclusion that Mr. Folmar's subjective complaints were not entirely consistent with the totality of the record, and evaluated the persuasiveness of the other medical opinions.  (Tr. 20-25.)  She then made the following findings with regard to Dr. Castro's medical opinions:

> I find the opinions of Dr. Castro from September 2020 and August 2021 <u>not persuasive</u> as <u>the level of limitation was simply not supported by the record that reflects other mental status findings</u> that include a stable mood, alertness, attentiveness, cooperative and/or reasonable behavior, normal rate, rhythm, and tone of speech, appropriate grooming, intact memory, normal, coherent, and/or goal-directed thought process, grossly intact cognition, and/or a denial of suicidal ideation. [] Further, <u>the level of limitation, including the rate of absenteeism and off-task behavior, were not supported by the claimant's own reports</u> discussed in great detail above. [] <u>The opinions were not consistent with the opinions of the State Agency psychologists or the Consultative Psychological Examiner, but were somewhat consistent with the testimony of the claimant</u>.

(Tr. 26 (citations omitted) (emphasis added).)

The ALJ addressed supportability and consistency when she observed that the level of limitation opined by Dr. Castro was not supported by Mr. Folmar's mental status findings, based on records from both Dr. Castro and other providers.  (*Id.*)  The same is true of her observation

that the level of limitation was not supported by Mr. Folmar's own reports, which she based on citations to records from Dr. Castro and others. (*Id.*) The ALJ also addressed consistency when she observed that the level of limitation opined by Dr. Castro was somewhat consistent with Mr. Folmar's testimony, but not with the opinions of the state agency psychological consultants or the consultative psychological examiner. (*Id.*) Thus, the ALJ addressed both the supportability of Dr. Castro's opinions and their consistency with the medical and other evidence of record, and clearly explained the basis for her persuasiveness finding.

The ALJ had already found the opinions of the state agency psychological consultants to be persuasive, except that their limitations "needed to be interpreted into vocationally relevant terms" in the RFC. (Tr. 24-25.) She had also already found the opinion of the consultative psychological examiner to be "partially persuasive," to the extent that it supported moderate limitations in three areas of mental functioning, but noted that it "did not provide specific functional limitations and was largely based on [Mr. Fomar]'s remarks." (Tr. 25.) The Court finds no support for Mr. Folmar's conclusory assertion that the ALJ's analysis lacked the support of substantial evidence or failed to build a logical bridge between the evidence and the result.

The Court also observes that Mr. Folmar misapplies the applicable legal standard when he argues the ALJ erred because "the[] records corroborated [Dr. Castro's] opinions" or because Dr. Castro's opinions were "supported by and consistent with the other contemporaneous medical records." (ECF Doc. 8, p. 12.) Even if a preponderance of the evidence supported a finding that Dr. Castro's opinions were persuasive, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.

The questions before this Court are whether the ALJ considered the full record in evaluating the persuasiveness of the opinion, appropriately articulated her reasons for finding the opinion unpersuasive, and made a determination that was supported by substantial evidence.  *See* 20 C.F.R. § 404.1520c (governing how ALJs consider and articulate findings regarding medical opinions); 20 C.F.R. § 404.1520(e) (findings regarding RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405 ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

For the reasons stated above, the undersigned finds Mr. Folmar has not met his burden to show that the ALJ failed to consider the entire record when evaluating the persuasiveness of the medical opinions, that she failed to sufficiently articulate her reasons for finding the opinions "not persuasive," or that her persuasiveness finding lacked the support of substantial evidence. Accordingly, the undersigned finds the first assignment of error to be without merit.

## C.  Second Assignment of Error: Whether ALJ Appropriately Considered Subjective Complaints, Including Waxing and Waning of Symptoms

Mr. Folmar argues the ALJ did not properly evaluate his symptoms under SSR 16-3p because the ALJ found he had moderate limitations in three categories of mental functioning—interacting and relating with others; concentrating, persisting, and maintaining pace; and adapting or managing himself—when his "documented symptoms supported the fact that [he] was seriously limited in his ability to function independently, appropriately, effectively, and on a sustained basis" in those areas.[3]  (ECF Doc. 8, pp. 13-17.)  He also asserts that the ALJ "failed to articulate any supportable rationale for her finding that [his] statements . . . were not entirely

---

[3] To the extent Mr. Folmar also intended to assert a separate Listings argument at Step Three of the sequential analysis, that argument was not clearly articulated or adequately developed and is deemed waived.  *See Hollon*, 447 F.3d at 491; *McPherson*, 125 F.3d at 995.

consistent with the medical evidence." (*Id.* at p. 18 (citing Tr. 22).)  He characterizes the ALJ's analysis of his symptoms as "insufficient" and "boilerplate," and argues the analysis "did not comply with the requirements of SSR 16-3p." (*Id.* at p. 19.)  He further argues that the ALJ failed to consider the waxing and waning of his symptoms.[4]  (*Id.* at pp. 20-21.)  In response, the Commissioner argues that the ALJ reasonably evaluated Mr. Folmar's subjective symptoms, including those highlighted in Mr. Folmar's brief, considered the appropriate regulatory factors, and made a decision that was supported by substantial evidence.  (ECF Doc. 9, pp. 20-23.)

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see also Alexander v. Kijakaz*i, No. 1:20-cv-1549, 2021 WL 4459700, *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); see also 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec*., 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 82 Fed.

---

[4] While this underdeveloped argument is set forth in a third and separate assignment of error, it is effectively another challenge to the ALJ's analysis of Mr. Folmar's subjective complaints, and will be addressed as such.

Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 21, 23-24), so the discussion will focus on the ALJ's compliance with the second step.

In undertaking this analysis, an ALJ considers objective medical evidence, a claimant's subjective complaints, information about a claimant's prior work record, and information from medical and non-medical sources.  SSR 16-3p, 82 Fed. Reg. 49462, 49464-49466; 20 C.F.R. 404.1529(c)(3).  Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. 404.1529(c)(3).

Here, a review of the decision reveals that the ALJ considered the entire record, based her findings on relevant factors, and provided "specific reasons for the weight given to the individual's symptoms," SSR 16-3p, 82 Fed. Reg. 49462, 49467.  At Step Three, she supported her findings of moderate limitations in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself with a detailed discussion of reported symptoms and limitations, objective mental status examination findings, and reported activities. (Tr. 18-19.)  At Step Four, the ALJ again provided a detailed outline of Mr. Folmar's reported symptoms and limitations, but explained that his statements regarding the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e] decision."  (Tr. 21.)  She then provided a detailed summary of his psychiatric treatment records, including a specific discussion of his reported symptoms, mental status findings, and reported activities.  (Tr. 21-23.)  After this summary, the ALJ returned to the issue of Mr. Folmar's symptoms, and found as follows:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms from his severe impairments, they are inconsistent because

20

the level of limitation alleged is not altogether consistent with the totality of the record. The claimant underwent treatment, which included psychotropic medication, medication management, and counseling, to control the symptoms of his severe mental impairments. [] Reported symptoms include intrusive thoughts, flashbacks, nightmares, avoidant behaviors, hypervigilance, having a temper or anger, crying, withdrawal from others, no longer findings enjoyment in pleasurable activities, trouble sleeping at night, low energy level, getting easily fatigued, depression, unable to work around or with a lot of people, problems interacting with coworkers and supervisors, low tolerance for things, and difficulty with crowds, memory, completing tasks, concentration, understanding, and following instructions. [] Significant mental status findings include a flat and/or frustrated affect and a frustrated or anxious mood and/or a mood and affect with some depression and anxiety, difficulty to engage, low voice, and/or little spontaneous conversation. [] Significant mental status findings from the consultative psychological examination include a depressed mood, a flat affect, and remembering one of three objects after a five-minute delay. []

However, other mental status findings include a stable mood, alertness, attentiveness, cooperative and/or reasonable behavior, normal rate, rhythm, and tone of speech, appropriate grooming, intact memory, normal, coherent, and/or goal-directed thought process, grossly intact cognition, and/or a denial of suicidal ideation. [] Other mental status findings from the consultative psychological examination include adequate grooming and hygiene, adequate receptive language skills, no tearfulness, no expression of imminent or acute suicidal thinking, no indications of anger or hostility, the ability to follow the conversation, not asking for repetition and/or clarification of questions, correctly completed three iterations of serial sevens in third seconds, mentally calculated twenty-four divided by three and one quarter of two hundred, and sufficient appearing judgment. (3F). In some treatment records, the claimant reported volunteering at church, keeping himself busy with household projects, doing alright, keeping busy, grocery shopping, delivering food to families in need, misses a routine and interacting with others outside of his family home, getting projects done around his house, focusing on skills to reduce anger and negative mood, managing his anger better, and/or looking for employment. [] In other treatment records, the claimant reported some improvement with medication or that his medication was helping. []

Nonetheless, functional limitations are warranted. In order to account for the claimant's moderate limitations with interacting with others, concentration, persistence, or maintaining pace, and adapting or managing oneself, the claimant would be limited to perform simple, routine tasks, but not at a production rate pace, the claimant could have occasional interactions with supervisors, co-workers, and the public, and the claimant would be limited to routine workplace changes.

(Tr. 23-24 (citations omitted).)

Thus, the ALJ's decision clearly reflects that she considered Mr. Folmar's reported symptoms, his treatment modalities, his response to treatment, the objective medical findings noted in his treatment records, and his reported activities of daily living in support of her finding that Mr. Folmar's subjective statements were not entirely consistent with the totality of the record.  (Tr. 18-19, 21-24.)  Mr. Folmar's conclusory arguments that the ALJ's decision:

> failed to contain specific reasons for her finding on credibility, was not supported by the evidence in the case record, and was not sufficiently specific to make clear to the individual and to any subsequent review[er]s the weight the ALJ gave to [his statements] and/or the remainder of the evidence in this matter[,]

(ECF Doc. 8, p. 19) are without merit.  He has failed to identify any specific evidence the ALJ should have—but failed to—consider in analyzing his subjective symptoms, and the Court's own review of the records and decision does not fill that gap.

Mr. Folmar's conclusory argument regarding the waxing and waning of his symptoms also does not change the Court's analysis, and his citation to *Keyse v. Saul*, No. 1:19-CV-02495-DAR, 2021 WL 1214691 (N.D. Ohio Mar. 31, 2021), is unavailing.  (*Id.* at pp. 20-21.)  In *Keyse*, the court found that an ALJ's findings regarding a provider's medical opinion lacked the support of substantial evidence when the ALJ had failed to also consider earlier decisions by the same provider, and therefore "did not consider the entire record regarding the waxing and waning of Plaintiff's symptoms[.]"  *Keyse*, 2021 WL 1214691, at *20.  Here, Mr. Folmar has failed to identify any specific evidence that the ALJ failed to account for in her analysis, and has failed to otherwise demonstrate that the ALJ's findings lacked the support of substantial evidence.

Ultimately, Mr. Folmar is asking this Court to reconsider evidence that was already considered and weighed by the ALJ.  It is not this Court's role to "try the case *de novo*, . . . resolve conflicts in evidence, []or decide questions of credibility."  *Garner*, 745 F.2d at 387.  Instead, this Court may only consider whether the ALJ's findings were supported by substantial

22

evidence.  Indeed, even if substantial evidence supported Mr. Folmar's interpretation of the evidence, this Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

For the reasons set forth above, the Court finds the ALJ was supported by substantial evidence in finding Mr. Folmar's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the evidence of record.  Accordingly, the undersigned finds the second assignment of error to be without merit.

### VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

March 4, 2024

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge